IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

CLERKS OFFICE US DISTRICT COURT
AT HARRISONBURG, VA
FILED

11/05/2025

LAURA A. AUSTIN, CLERK
BY: /s/ Amy Fansler
DEPUTY CLERK

ADAM ARMSTRONG,                )
    Plaintiff,              )
                    )    Civil Action No. 5:19-cv-00040
v.                            )
                    )    By:  Elizabeth K. Dillon
KRISTY ACORD,[1]              )        Chief United States District Judge
    Defendant.              )

**MEMORANDUM OPINION
OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Adam Armstrong brings this action against his ex-wife, defendant Kristy Acord, stemming from an incident that took place on or around June 9, 2017.  While the court detailed the background of this case in an earlier memorandum opinion (Mem. Op. 26, Dkt. No. 117), the key relevant facts for present purposes are that Acord, accompanied by sheriff's deputies, entered Armstrong's home without his consent during a domestic dispute to retrieve her belongings—despite having no legal right to enter the property under the parties' premarital and separation agreements.  During this encounter, Armstrong alleged that his passport and car key fob went missing.

In a prior ruling on Armstrong's partial motion for summary judgment, the court granted judgment in his favor on two counts: Count V (Common Law Trespass) and Count VI (Conversion).[2]  The court found that Acord trespassed as a matter of law, as she lacked any

---

[1]  Kristy Acord was previously known as Kristy Marie Roadcap in earlier filings in this case.

[2]  The prior ruling also addressed a motion for summary judgment filed by the other defendants in this case, granting that motion in full and dismissing all claims against them.  (*See* Dkt. No. 118.)  Armstrong also moved for summary judgment on several other counts against Acord.  However, the court denied summary judgment on those additional claims.  (*Id.*)  This opinion does not revisit the claims involving the dismissed defendants.  Nor does it address the other claims against Acord on which summary judgment was denied, because Armstrong has confirmed that he is no longer pursuing those claims.  (Dkt. No. 173.)  Instead, he seeks damages only on the two claims for which summary judgment was granted—common law trespass and conversion.  (*Id.*)  Therefore, this opinion addresses the sole remaining issue in the case: the appropriate measure of damages on those two claims.

ownership or possessory interest in the residence and remained there over Armstrong's objection, interfering with his property rights.  As to conversion, Acord's failure to respond to requests for admission was deemed an admission that she took Armstrong's passport and car key fob, entitling Armstrong to summary judgment on that claim as well.  (*See* Mem. Op.; Dkt. No. 118.)

On March 11, 2025, the case proceeded to a bench trial limited to the issue of damages as to those two counts.  Armstrong was represented by counsel, and Acord appeared pro se.  The court heard testimony from multiple witnesses, reviewed admitted exhibits, and considered post-trial briefing submitted by the parties.  Armstrong filed a memorandum in support of damages (Dkt. No. 173), and Acord submitted a response (Dkt. No. 174).

Based on the trial evidence, the court issues this memorandum opinion, which constitutes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.  LEGAL STANDARD

Rule 52(a)(1) of the Federal Rules of Civil Procedure requires that the court make specific findings of fact and state conclusions of law separately in any action tried without a jury.  Specifically, this court must evaluate the testimony and demeanor of witnesses, as well as weigh the evidence and choose among conflicting inferences those which seem most reasonable.  *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885, 889–90 (4th Cir. 1964).

The court must do more than announce statements of ultimate fact, *United States ex rel. Belcon, Inc. v. Sherman Constr. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986), but it is not required "to make findings on all facts presented or to make detailed evidentiary findings[.] . . . The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are

supported by the evidence." *Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962).

## II.  FINDINGS OF FACT

### A.  Armstrong and Acord's Relationship Was Volatile.

On May 16, 2015, Armstrong and Acord were married in Harrisonburg, Virginia.  (Pl. Ex. 21 ¶ 1.)  Just over a year later, the couple had a child together on July 11, 2016.  (*Id.* ¶ 2.) Acord also had children from prior relationships, including her daughter, Chazlyn, who lived with her throughout her relationship with Armstrong.[3]

Armstrong and Acord had a tumultuous relationship throughout their marriage and in the period leading up to the events giving rise to this incident.  The couple experienced numerous disputes over the years.  One such incident occurred in March 2016, when Armstrong, Acord, and Acord's children from a prior relationship traveled to Texas to visit one of Acord's friends. During the trip, the couple got into an argument, and Armstrong left Acord and her children in Texas.  When Acord returned home, she discovered that she and her children were locked out of Armstrong's house.  Acord then filed a motion for emergency relief in the Circuit Court of Rockingham County, requesting permission to retrieve her work computer—which she needed for her job as a registered nurse at Sentara Health—along with her children's school bookbags and clothing.  (Def. Ex. 13.)

Another incident occurred shortly thereafter, in April 2016, when Acord was pregnant with the couple's child.  Acord had provided testimony to law enforcement officers that led to Armstrong being charged with two felonies and two misdemeanors.  Armstrong fought the charges for over five months.  The case was eventually nolle prossed after Acord provided an

---

[3] Chazlyn's name is used throughout this opinion because she testified at trial as an adult, over eighteen years of age.  At the time of the incident giving rise to this case, however, she was in her early teens. (*See infra* n. 6.)

affidavit stating:

> On April 10, 2016, my husband and I did engage in an oral argument. However, due to the hormonal effects of my pregnancy, I overreacted and my husband only attempted to calm me down. He did not harm me or hold me against my will, in any way.[4]

(Pl. Ex. 52a ¶ 13.) Armstrong described the night he was arrested as one of the worst nights of his life.

These and other incidents eventually led the couple to enter into a separation agreement on January 20, 2017. (Pl. Ex. 21 ¶ 11.) The final order of divorce indicates that Armstrong and Acord's separation after January 20, 2017, was "continuous, uninterrupted and without cohabitation since that date." (*Id.* ¶ 8.)

However, the parties continued to attempt reconciliation, and Acord moved back into Armstrong's house with her daughter, Chazlyn, for some period of time after January 20, 2017. These reconciliation efforts included Armstrong hosting a Mother's Day dinner for Acord in 2017 and the two celebrating their anniversary on May 16, 2017. (*See* Def. Ex. 7.) Additionally, the couple exchanged flirtatious text messages during their separation. For example, in a May 10, 2017 text message thread, Armstrong asked Acord, "U miss me?" to which Acord replied, "Yes I miss you very much I can't wait for you to hold me and rub my butt[.]" (Def. Ex. 1.) Armstrong responded, "Awe perfect baby[.]" (*Id.*) Hours later, Acord messaged Armstrong, "Hurry home daddy I love you[,]" and Armstrong replied, "Awe thanks baby love u too!" (*Id.*)

On June 8, 2017, Armstrong and Acord had another argument which resulted in Acord and her daughter moving out of Armstrong's home. This time, however, the move was permanent.[5]

---

[4] After the charges were dropped, Armstrong filed a lawsuit for malicious prosecution, in which he received a favorable outcome and was awarded approximately $24,000 on an accompanying negligence claim.

[5] Armstrong and Acord's divorce was finalized on January 8, 2019. (Pl. Ex. 21.)

4

**B. Acord Trespassed on Armstrong's Property.**

On June 8, 2017, Acord and her daughter, Chazlyn, were residing in Armstrong's home. Acord's work laptop, medical bag, and other property, including Chazlyn's clothes, were in the house.

Armstrong and Acord were cordial during the afternoon hours of June 8, 2017, expressing their love for each other through text messages. (Def. Ex. 8.) However, the couple got into an argument later in the evening. At 7:41 p.m., Armstrong texted Acord, "U leaving?" to which Acord responded, "Yea I need to get out for a little, you've been on a war path since I got home and no one deserves it . . . ." A contentious text exchange followed, with Acord eventually saying, "I'll start looking for a place tomorrow and until I can I'll stay in the egg house[.]" Armstrong responded, "U caused this mess[.]" (*Id.*)

At approximately the same time that Armstrong was texting with Acord, he also sent a series of text messages to Chazlyn.[6]



> Jun 8, 2017, 7:43 PM
>
> Maybe u should go live with your daddy
>
> No response ? Go figure
>
> Honestly I can't stand u!!!
>
> R u moving in with your daddy?
>
> Hopefully he doesn't teach u anything bc he doesn't know anything good

(Def. Ex. 15.)

Acord offered to come and get her belongings with the police and then arrange to have a

---

[6] To get a sense of Chazlyn's age at the time of this incident, the court notes that she had graduated from eighth grade only days prior.

moving company retrieve the rest of her things from Armstrong's home.  Armstrong responded, "you are not welcome here please do not come here I do not want to see or be around you you have no business or right to be anywhere on the property of 4111 Spotswood trail penn laird va 22846[.]"  Acord responded, "This is where I live and I need my clothing[.]"  Armstrong replied, "You just acknowledged what I text coming here will be trespassing and u live at [different address.]"  (*Id.*)

In the early morning hours of June 9, 2017, at approximately 5:16 a.m., Acord texted Armstrong, "Please set my work supplies at the end of the driveway[,]" to which Armstrong did not reply.  (Def. Ex. 8.)  Armstrong, hearing something outside, saw Acord outside his house that morning trying to gain entry.  He confronted her through the door, asking her to leave multiple times and stating that she did not have a right to be there.  Keeping the doors locked, Armstrong then went to tend to the couple's 11-month-old daughter, who had awoken.  He made her a bottle, took her out of her crib, and returned to his bedroom, on the top floor of his home, to feed her.

Because Armstrong would not allow Acord inside his home to get her belongings, Acord called the police for assistance.  When the police arrived, Acord found a spare key to the home hidden outside.  She cut a hole in the screen storm door to access the exterior door, then used the key to unlock the door and enter Armstrong's home.  The two police officers followed Acord inside Armstrong's home and announced their presence.  One of the officers, Officer Conley, testified to seeing photographs of Armstrong, Acord, and Chazlyn hanging on the wall inside the home.

Around 6:00 a.m., Armstrong heard footsteps walking up the stairs to the top floor of his home, where he was in his bedroom with his daughter.  He walked out of his room and saw two

6

uniformed officers and Acord down the hall in another room.  Armstrong told them they had no

right to be there, that he and Acord were separated, and that she had no right to be in his home.

One of the officers escorted Armstrong to the bottom of the stairs while Officer Conley

accompanied Acord to Chazlyn's bedroom and another room on the top floor to gather her

clothes and her daughter's clothes.  Acord then looked for her work laptop throughout the house

but was unable to find it.[7]  Once Acord had gathered some belongings, the officers and Acord

left Armstrong's house.

Later that month, Armstrong arranged for movers to remove the remainder of Acord's

belongings from his home, with the move completed in early July 2017.

## C.  Resulting Damages

Armstrong seeks three categories of damages: property, emotional distress, and punitive.

The court's findings of fact with respect to each category are set forth below.

### 1.  Property

Three items of property were identified as either damaged or missing as a result of the

incident.  First, the screen on Armstrong's storm door was damaged when Acord cut it open to

gain entry into Armstrong's home.  Second, the key fob to Armstrong's Infiniti SUV went

missing following the incident.  Third, Armstrong's passport was also missing after the incident.

For the reasons discussed in more detail in the court's conclusions of law, the court finds

that Armstrong is entitled to limited damages and specifically is entitled only to damages for the

---

[7]  Acord required her work-issued laptop to perform her duties at Sentara Health.  Ramona Eppard (formally Ramona Patterson), a Registered Nurse and Regional Administrator for Sentara Health, testified that it would have been impossible for Acord to carry out her job responsibilities without the work-issued laptop, as it contained all necessary patient information and protected health information.

Acord reported the missing laptop to Eppard, who then filed an incident report with Sentara Health and notified law enforcement on June 12, 2017.  (Def. Ex. 18.)  Shortly thereafter, upon conducting a further search of his home, Armstrong located Acord's laptop bag behind a door.  He provided the laptop to his attorney, and it was subsequently returned to Sentara Health.

missing key fob and passport and for damage to his home's screen door.  The court finds the appropriate amounts to be $652.88 for the key fob, $145.00 for the passport, and $200.00 for repair and rekeying of the doors.

### a.  Key fob

Armstrong testified that the total charge to replace and program two new key fobs was $626.31.  The receipt reflects that his insurance covered $60.00 of that amount, and that $26.57 in sales tax was added to the remaining balance.  (*See* Pl. Ex. 1.)  Thus, Armstrong's total out-of-pocket expense for the replacement of the key fobs was $592.88.  (*Id.*)  Under Virginia law, the "collateral source rule" holds that compensation received by a plaintiff from a source independent of the tortfeasor may not be used to reduce the damages recoverable from the tortfeasor.  *See Bullard v. Alfonso*, 595 S.E.2d 284, 285–86 (Va. 2004).  Accordingly, Armstrong is entitled to recover the full $652.88, representing both his out-of-pocket payment of $592.88 and the $60.00 in insurance proceeds itemized on the bill.  (*See* Pl. Ex. 1.)  The court therefore finds damages in the amount of $652.88 for replacement of the key fobs to Armstrong's vehicle.[8]

### b.  Passport

Armstrong testified that he paid $205.00 to obtain a new passport.  However, the receipt indicates that this amount includes a $60.00 expedited processing fee.  (Pl. Ex. 14.)  There is no evidence in the record explaining why expedited processing was necessary to replace the passport, or why the cost of such processing should be included in the passport's value.  Therefore, the court will exclude this fee from the damages amount.  Accordingly, the court finds

---

[8]  At trial, the court questioned Armstrong as to why he obtained two replacement key fobs when only one had gone missing.  Armstrong explained that he was concerned about the security of his vehicle if he replaced only the missing fob with one programmed the same way.  To ensure the vehicle's security, he opted to purchase two entirely new, reprogrammed key fobs.  The court finds it appropriate to base the damages for the missing key fob on the total cost of replacing both key fobs.

damages in the amount of $145.00 for replacement of Armstrong's passport.

    *c. Storm door*

    As noted above, the screen storm door was damaged to gain access to the exterior door that Acord unlocked to gain entry. (*See* Pl. Exs. 2, 4, 42, 43, 44, 46, 47.) Armstrong testified that it cost him approximately $200.00 to repair the screen storm door and have the doors rekeyed. The court finds this amount to be reasonable. Accordingly, the court finds damages in the amount of $200.00 for property damage caused by Acord's trespass into Armstrong's home.

    **2. Emotional Distress**

    To support his claim for emotional distress damages, Armstrong presented evidence of his alleged Post-Traumatic Stress Disorder (PTSD) and subsequent behavioral changes, both of which he attributed to Acord's trespass on June 9, 2017. The court addresses each of these points in turn.

    *a. PTSD*

    Armstrong called Ginger Neff, a certified trauma specialist and licensed professional counselor in Virginia, with twelve years of experience, to testify on his behalf. Neff opined that Armstrong suffers from PTSD as a result of the June 9, 2017 trespass. Her opinion was based on Armstrong's initial assessments completed prior to his intake meeting, as well as her observations and evaluation during that intake meeting, which occurred on December 9, 2024, more than seven years after the alleged traumatic event and three months before the bench trial.

    Neff testified that she was aware of Armstrong's difficult childhood, including being kicked out of his parents' home at age sixteen, a period during which he experienced homelessness and hunger. She also considered Armstrong's prior legal history, including a prior arrest for possession with intent to distribute and conspiracy to distribute marijuana, the 2016

incident where he was falsely charged with two felonies and two misdemeanors, as well as the events of June 9, 2017.

During her initial assessment, Neff reviewed several PTSD diagnostic criteria, crossing out those that did not apply to Armstrong. Notably, she struck out the criterion for "Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects" indicating that Armstrong did not exhibit this particular indicator of PTSD. Based on the limited intake assessment and the brief meeting with Armstrong, Neff concluded that his PTSD stemmed directly from the June 9, 2017 trespass.

On cross-examination, it was revealed that Neff was unaware of several prior incidents, including a 2006 arrest for second-degree assault, false imprisonment, burglary, and destruction of property involving a former girlfriend, as well as an incident recorded on Chazlyn's phone in January 2017 (Def. Ex. 14), the same month Armstrong and Acord signed their separation agreement. The following exchange captures a portion of dialogue between Armstrong, Acord, and Chazlyn during the January 2017 incident, which occurred about five months before the incident that allegedly caused Armstrong's PTSD.[9]

| | |
|---|---|
| Armstrong: | Really, why do you think you can scream divorce all the time and it's okay? You've been doing it since the first day we married. Huh? Answer me. |
| Acord: | [inaudible] |
| Armstrong: | So, why do you? Cause you don't believe that. You're just saying whatever at the moment. |
| Acord: | [inaudible] |
| Armstrong: | Did you not? Ten minutes ago, did you not just say |

_____

[9] The court notes that the audio was captured through video recording by Chazlyn in an adjacent room to where Armstrong and Acord were arguing. Much of Acord's voice is quiet and barely audible, while Armstrong's yelling can be heard more clearly. The court transcribes the recording exactly as it is heard, except that profanity and racial epithets spoken by Armstrong are modified. No corrections are made to grammar or slang.

you want a divorce?  Huh?  Look at me.  So, what makes you think that's okay?

Acord:          Adam, I don't want to argue.

Armstrong:      Huh?  Really, what makes you think that's okay?

Acord:          [inaudible]  I don't want to argue.  [inaudible]

                [loud noise of something slamming]

Armstrong:      [inaudible]   What makes you think that's okay?  Huh?  You're gunna sit here and tell me why.

Acord:          Adam, I don't want to fight.  I just.  I'm trying to pack my things and leave.

Armstrong:      I don't care what you do or don't want.

Acord:          Of course you don't.  You never have.

Armstrong:      Oh right, right, right.  That's why I've put up with you saying you want a divorce five hundred times.  Because that didn't mean "I was just upset. I was just mad. Ah blah, blah, blah, blah, blah."  Who gives a f***.   You're emotionally f***ed up because [inaudible].  Tell me why you think it's okay?  You obviously do because you continue to do it.

Acord:          [inaudible]

Armstrong:      You're right, you shoulda found you another n***er to [inaudible].  Or another g**k to [inaudible].  But no, you wanted to go f*** with my life.

Chazlyn:        [crying in an adjacent room]

Armstrong:      Chazlyn, shut the f*** up! Stop crying! Stop crying!  Your ungrateful a** attitude. You always try to manipulate me.

                [Armstrong slams open the door where Chazlyn is.]

                Trying to push me against your mother.  Trying to put your [inaudible] where it don't belong.  Trying to be disrespectful. F*** you and your ungratefulness!

|            | You hear me?  Your daddy's a junkie.  The other one's f***'ing dead. [inaudible]  I've done for you.  And all you do is say "[inaudible]."  Nobody gives a f***!  You hear me? |
|------------|---|
| Chazlyn:   | [crying] yes, sir. |
|            | [Armstrong walks back in the room where Acord is.] |
| Acord:     | Stop throwing my things out. |
|            | [things being thrown around] |
| Armstrong: | I said you're gunna sit here and tell me why you think it's okay to say you want a divorce 500 times. |
| Acord:     | Why are you doing this [inaudible] around the baby?  Could you just stop?  I'm just [inaudible] |
| Armstrong: | The one you wanted to murder?  The one you wanted to murder?  Let's keep it real.  Huh? |
| Acord:     | Stop.  Why are you [inaudible].  Just let me get my things. |
| Armstrong: | Tell me why? [inaudible] |
| Acord:     | Because you are evil.  You are evil. |

(Def. Ex. 14, 00:47–04:32.)

Neff's opinion relies heavily on Armstrong's self-reported symptoms during a brief evaluation lasting just a few hours.  She was unaware of prior incidents demonstrating clear aggressive behavior and angry outbursts, including documented verbal abuse directed at a child, as evidenced by the transcription above.  While Neff acknowledges many difficulties Armstrong has faced throughout his life, she does not adequately explain why these experiences did not result in PTSD.  Instead, she attributes the condition solely to the June 9, 2017 trespass.

Indeed, as noted above, in her intake assessment, Neff specifically crossed out "Irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or

12

physical aggression toward people or objects." The January 2017 recording, however, depicts precisely such an angry outburst. Neff herself testified that this outburst could be a symptom of PTSD. Accordingly, if Armstrong does suffer from PTSD, the evidence suggests that the condition may have existed well before the June 9, 2017 trespass.

Therefore, the court finds that Neff's opinion fails to account for significant evidence that contradicts her conclusions. Moreover, her opinion was based only on the initial intake meeting and accompanying assessments, conducted over seven years after the incident in question and right before the bench trial. For these reasons, the court gives no weight to Neff's expert opinion that Armstrong suffers from PTSD as a result of the June 9, 2017 trespass.

*b. Behavioral changes*

In addition to his own testimony, Armstrong called on his pastor, Josh Shifflett, and friend, LaToya Russell, to testify to his changed behavior as a result of the June 9, 2017 trespass. For the following reasons, the court gives little, if any, weight to the testimony of the three as it relates to behavior changes directly stemming from the trespass.

Pastor Shifflett testified that he has known Armstrong for 11 years and speaks with him almost daily. He stated that he has known the couple throughout their marriage and had genuinely hoped their relationship would succeed. He expressed disappointment over the failure of the marriage. Shifflett described the relationship as on-and-off, characterized by numerous incidents between the two. He considered the trespass incident to be the definitive end of the relationship, even though the couple had already legally separated at that time. He also testified to his awareness of prior issues between Acord and Armstrong before the June 9, 2017 incident, including both civil cases and criminal complaints. Shifflett further testified that he was unsure whether Armstrong will ever be able to form a close relationship with a woman again. However,

he could not say whether that is specifically because of the June 9, 2017 incident or the cumulative impact of the failed marriage and the various conflicts involved.

The court finds Shifflett to be a credible witness. However, his testimony does not establish that any change in Armstrong's behavior resulted from the trespass. Rather, the court finds that Shifflett's testimony supports the conclusion that the marriage itself was tumultuous and had a progressively negative effect on both parties over time. Although the trespass marked a definitive moment in the relationship, it was not the sole cause of any behavioral changes in Armstrong. Instead, the court finds that any changes likely were the product of the entirety of the marriage and the many conflicts between the two.

Latoya Russell testified that she has known Armstrong for approximately 18 years. She described the version of Armstrong she knew prior to this incident as fun-loving, very open, full of life, outgoing, and surrounded by many friends. In contrast, she testified that the person he is now is much more reserved, standoffish, distrustful, and hesitant to open up. However, Russell acknowledged that she was not familiar with Armstrong in the context of his relationship with Acord. She explained that her contact with Armstrong resumed only about three years ago, and they now speak a few times per week. Prior to that, they had little to no contact, as Armstrong had moved away approximately ten years earlier. Consequently, the version of Armstrong she knew previously dates back roughly eighteen years (or at least ten years), whereas the version she knows now reflects his demeanor as of three years before trial—well after the events surrounding the June 9, 2017 trespass. Accordingly, the court gives no weight to Russell's opinion that Armstrong's behavioral changes resulted from the June 9, 2017 trespass.

Armstrong testified that he has changed significantly since the trespass, describing a persistent sense of fear, distrust, and withdrawal. He stated that he now constantly checks locks,

sets his security system, and remains on alert for potential threats.  He explained that he struggles with paranoia and has difficulty trusting others.  However, on cross-examination, Armstrong acknowledged that his emotional distress was not solely the result of the June 9, 2017 trespass. He agreed that the 2016 incident, during which he was falsely charged with multiple offenses, also contributed to his trauma.  Although he later asserted that the majority of his distress stemmed from the trespass, his testimony and the overall record do not support that conclusion. The court finds that any emotional or behavioral changes in Armstrong are more likely the cumulative result of his turbulent and volatile relationship with Acord, along with other prior significant stressful events in his life (*see* discussion *supra* Sec. II.C.2.a.), rather than the trespass alone.  Accordingly, the court gives no weight to Armstrong's testimony that his anxiety, distrust, and social withdrawal were primarily caused by the June 9, 2017 trespass.

Armstrong also testified that he was once a very charitable man, donating approximately $250,000 worth of toys to children in need during the holidays.  He stated that the incident caused him to reduce his charitable giving and that the resulting distress led him to move out of a home that held significant sentimental value.

However, the evidence shows that after this incident, Armstrong continued to donate— albeit at a somewhat reduced level—to children in need and to his church.  He also accepted a board position with The Arc, a nonprofit organization that advocates for and assists adults with disabilities.  The General Assembly even recognized his charitable contributions since 2013 in a resolution in February 2023, also noting a recent contribution.  (Pl. Ex. 22.)  In addition, Armstrong is currently constructing a 10,700-square-foot residence—approximately double the size of his current home.  He testified that he did not know the total cost of the new home because construction was not yet complete but estimated the cost to be approximately $2 million.

15

Accordingly, the court gives little weight to Armstrong's testimony that his charitable giving has decreased and that he moved from his prior residence due to mental anguish resulting from the June 9, 2017 trespass. The evidence demonstrates that Armstrong continued to contribute his time and resources well after 2017. Furthermore, the court finds it more likely that any reduction in his charitable giving, if it occurred, is attributable to his investment in constructing a multi-million-dollar home rather than to the alleged emotional distress stemming from the trespass.

### 3. Punitive Damages

Acord did not act with malice when she trespassed Armstrong's home on June 9, 2017. Her motivation to enter the home was to retrieve her work laptop, which was required for her to perform her work duties for Sentara Health, and to obtain clothing for herself and her daughter Chazlyn. She called police to deescalate the situation, as her relationship with Armstrong was volatile.

### III.  CONCLUSIONS OF LAW

As previously noted, the court has already granted summary judgment in Armstrong's favor on his claims of conversion and common law trespass against Acord. Accordingly, the only issue remaining is the determination of damages. The court now sets forth its conclusions regarding the appropriate measure of damages for each claim, addressing conversion first, followed by common law trespass.

### A.  Conversion

In his prior partial motion for summary judgement, Armstrong claimed his passport and car key fob went missing after Acord and the deputies entered his home. In ruling on the motion, the court noted that although Acord testified in her deposition that she did not take the items, her

failure to respond to requests for admission was deemed an admission that she had taken both the passport and the key fob.  Because these admissions contradicted her deposition testimony, any resulting dispute of material fact was insufficient to preclude summary judgment.  Accordingly, the court granted summary judgment against Acord on the conversion claim relating to Armstrong's key fob and passport.  (Mem. Op. 26.)

"The tort of conversion encompasses a wrongful exercise or assumption of authority over another's goods or chattels, depriving him of their possession[,] and any act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *McCants v. CD & PB Enters., LLC*, 897 S.E.2d 209, 213 (Va. 2024) (citation omitted).  The measure of damages for conversion "is the value of the property converted at the time and place of the conversion." *Kirdassi v. White*, 913 S.E.2d 311, 329 (Va. Ct. App. 2025) (citing *Straley v. Fisher*, 10 S.E.2d 551, 552 (Va. 1940)).  The plaintiff bears the burden of proving damages by a preponderance of the evidence. *Shumate v. Mitchell*, 822 S.E.2d 9, 18 (Va. 2018) (citing *Gilliam v. Immel*, 795 S.E.2d 458, 462 (Va. 2017)).

For the reasons discussed in the court's findings of fact, the court will award damages in the amount of $652.88 for the replacement of the key fobs to Armstrong's vehicle and $145.00 for replacement of his passport.  Accordingly, the court will award total damages awarded on the conversion claim in the amount of $797.88, as this amount accurately reflects the value of the items at the time and place of the conversion.

## B.  Common Law Trespass

Having addressed the conversion claim, the court now turns to the appropriate measure of damages for Armstrong's claim of common law trespass.  In his prior partial motion for summary judgement, Armstrong argued that Acord trespassed by unlawfully entering his home

accompanied by deputies. The court agreed, finding that Acord committed common law trespass based on the parties' premarital and separation agreements, which established that she had no possessory interest in the property. Despite Armstrong's request, Acord refused to leave and remained inside to collect personal belongings, interfering with Armstrong's possessory rights. Accordingly, the court granted summary judgment in Armstrong's favor on the trespass claim. Armstrong now seeks three categories of damages: property, emotional distress, and punitive. The court addresses each category in turn.

### 1. Property

Armstrong seeks damages for repairs to his home caused by Acord's trespass, as well as reimbursement for the replacement of his key fob and passport. Having already awarded damages for the missing key fob and passport, the court now considers whether Armstrong is entitled to any additional compensation for property damage.

In Virginia, common law trespass "is an unauthorized entry onto property which results in interference with the property owner's possessory interest therein." *Cooper v. Horn*, 448 S.E.2d 403, 406 (Va. 1994) (quoting 5 Richard R. Powell, *The Law of Real Property* ¶ 707 (Patrick J. Rohan ed., 1994)). "A trespass is willful if it is committed [in bad faith; with intentional disregard of the rights of another; with gross negligence regarding the rights of another]. A trespass is not willful if it is committed [unintentionally; accidentally; inadvertently; by mistake] under a good faith claim of right." Virginia Model Jury Instructions—Civil Instruction No. 27.010 (2025). Every trespass is presumed to be willful, and the burden of proof lies with the defendant to demonstrate that it was not. *Barnes v. Moore*, 98 S.E.2d 683, 684 (Va. 1957) (citing *Wood v. Weaver*, 92 S.E. 1001, 1003 (Va. 1917)). "If the defendant's act was a willful trespass, the measure of damages is the value of the (specify goods) with any increase in

18

their value attributable to the labor of the defendant."  Virginia Model Jury Instructions—Civil Instruction No. 27.040 (2025).  "If the defendant's act was not a willful trespass, the measure of damages is the value of the (specify goods) immediately before they were removed from the land."  *Id.*  The plaintiff bears the burden of proving damages by a preponderance of the evidence.  *Shumate*, 822 S.E.2d at 18 (citing *Gilliam*, 795 S.E.2d at 462).

Here, Acord's trespass was willful.  As already noted in this court's prior ruling on Armstrong's partial summary judgment motion, the premarital and separation agreements show that Acord had no possessory interest in Armstrong's home.  Armstrong told Acord that she had no right to be inside of his home and asked her to leave multiple times.  Furthermore, the evidence indicates that the screen door was either cut or torn to access the main door, which Acord then unlocked using a key to enter Armstrong's home.  There is a presumption of willfulness, and Acord has provided no evidence that her entry was unintentional, accidental, inadvertent, mistaken, or made under a good faith claim of right to Armstrong's home.  Accordingly, the court finds that Acord's trespass was a willful trespass under Virginia law.  Therefore, Armstrong is entitled to recover damages equal to the value of the property damaged, together with any increase in that value attributable to Acord's labor.[10]

For the reasons discussed in the court's findings of fact, the court will award damages in the amount of $200.00 for the property damage regarding the storm door caused by Acord's willful trespass into Armstrong's home.

### 2.  Emotional Distress

Armstrong argues that Acord's trespass caused him lasting emotional distress.  Once an

---

[10]  The court notes that the distinction between willful and non-willful trespass is immaterial to the property damage at issue.  Nonetheless, this distinction must still be made to accurately determine the proper measure of damages, particularly with respect to emotional distress damages, which can only be awarded if the trespass was deliberate.

outgoing, charitable, and trusting community member, he asserts that he has since become anxious, paranoid, and withdrawn. He cites his reduced charitable involvement, increased isolation, and his PTSD diagnosis, as evidence of his ongoing mental anguish, which he argues entitles him to damages for emotional distress. The court, however, disagrees and will not award damages for emotional distress.

Virginia law recognizes that "[w]here . . . trespass is deliberate and accompanied by aggravating circumstances, damages for emotional distress may be recoverable in the absence of physical injury." *Johnson v. Marcel*, 465 S.E.2d 815, 817 (Va. 1996) (*Marcel*); *see also Johns v. Stillwell*, Civil Action No. 3:07-cv-00063, 2009 WL 2390991, at *6–7 (W.D. Va. Aug. 4, 2009) ("As a matter of law, trespass damages include compensation for the emotional injuries caused by Defendant's destructive acts as a trespasser."). The plaintiff bears the burden of proving damages by a preponderance of the evidence. *Shumate*, 822 S.E.2d at 18 (citing *Gilliam*, 795 S.E.2d at 462).

Virginia jurisprudence provides limited guidance on what constitutes "aggravating circumstances" for emotional distress damages in deliberate trespass cases. In *Marcel*, the Virginia Supreme Court allowed plaintiffs to claim emotional distress damages where the landlord's trespass was deliberate and accompanied by aggravating circumstances. 465 S.E.2d at 817. There, the defendant landlord, after his relationship with the plaintiff tenants soured, entered the tenants' premises without consent, changed the garage locks, ripped out a telephone, blocked the driveway, made excessive noise by screaming and banging on doors, and threatened one tenant with arrest. These actions forced the tenants to vacate the premises prematurely, causing fear for their physical and mental well-being, loss of security deposits, and additional housing expenses. *Id.*

20

Similarly, in *Johnson v. Robert Shields Interiors, Inc.*, No. 1:15CV820, 2016 WL 2739270, at *9 (E.D. Va. May 11, 2016) (*Robert Shields*), the district court cited *Marcel* to award emotional distress damages to the plaintiff for defendant's trespass.  In that case, the defendant's agent and an accomplice repeatedly entered the plaintiff's home without authorization, despite her clear instructions that no one was allowed inside.  During these intrusions, the agent would take and leave items without consent, and in one particularly alarming incident, he and another man entered while the plaintiff was alone, upstairs, and in a bathrobe just after showering, prompting her to fear for her safety.  The court found that the repeated, deliberate nature of the trespasses, together with the invasive bathrobe incident, "amount to sufficiently aggravating circumstances to entitle plaintiff to the relatively modest amount requested of $10,000.00 for her emotional distress."  *Id.*

In this case, while Acord did willfully and deliberately trespass onto Armstrong's property, the circumstances differ significantly from those in *Marcel* and *Robert Shields*.  Throughout the course of the marriage, Acord and her daughter had moved in and out of Armstrong's home many times.  Acord's daughter had her own room filled with her possessions, and pictures of both Acord and her daughter hung on the walls of Armstrong's house.  Even after the separation agreement was entered into in January 2017, Acord and her daughter moved back into the home for a period of time until June 8, 2017, when they moved out permanently.  Armstrong testified that he was aware that Acord had her work laptop in his house the evening of June 8, 2017.  He knew that Acord was trying to retrieve items for herself and her daughter.  On the morning of June 9, 2017, Armstrong saw Acord outside attempting to collect her belongings but refused her entry and returned upstairs.

Although the relationship between Armstrong and Acord had been tumultuous, and the

circumstances surrounding the trespass may have been aggravating to Armstrong, the circumstances were not aggravated. Here, Armstrong refused Acord access to her possessions, including essential items such as her work laptop and her daughter's clothing, despite prior interactions indicating she was at his home only to collect her belongings. This is further supported by the fact that Acord called the police to assist her in retrieving her items. Acord's actions were thus motivated by necessity, rather than the deliberate, threatening, and invasive conduct seen in *Marcel* and *Robert Shields*.

Accordingly, although Acord's entry on June 9, 2017, was willful and deliberate, Armstrong has failed to demonstrate, by a preponderance of the evidence, that the circumstances surrounding Acord's trespass were sufficiently aggravating to support an award of emotional distress damages compensable under Virginia law. The court therefore finds that Armstrong is not entitled to emotional distress damages and declines to award such relief.[11]

### 3. Punitive

Armstrong argues that punitive damages are warranted because Acord acted with malice. He contends that Acord falsely reported to law enforcement that she lived with him and had been locked out of the residence. Armstrong further notes that Acord called the police in the early morning hours to gain entry, even though she could have waited for a more appropriate time and avoided unnecessarily exposing their 11-month-old daughter to police presence—an act he characterizes as a deliberate attempt to heighten his distress and discomfort. According to Armstrong, these actions are part of a recurring pattern of behavior in which Acord has sought to

---

[11]  Even assuming arguendo that the circumstances of the trespass were sufficiently aggravating, the court finds that Armstrong has not demonstrated that the alleged emotional distress he claims was caused by the June 9, 2017 trespass. His reliance on expert testimony from Neff, along with his own testimony and that of his pastor, Shifflett, and friend, Russell, does not credibly establish negative behavioral changes, reduced charitable giving, or ongoing mental anguish attributable to Acord's actions, for the reasons discussed in the findings of fact. (*See* discussion *supra* Sec.II.C.2.) Accordingly, Armstrong has not met his burden of showing compensable emotional distress damages under Virginia law.

cause him trouble and public embarrassment through deceitful or provocative conduct.  He argues that this pattern demonstrates malicious intent and supports an award of punitive damages.  The court disagrees.

Under Virginia law, "[p]unitive damages, the purpose of which is not so much to compensate the plaintiff but to punish the wrongdoer and to warn others, may be recovered 'only where there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others.'" *Hamilton Dev. Co. v. Broad Rock Club*, 445 S.E.2d 140, 143 (Va. 1994) (quoting *Giant of Virginia, Inc. v. Pigg*, 152 S.E.2d 271, 277 (Va. 1967)). However, the Virginia Supreme Court has emphasized that "punitive damages are generally not favored and 'should be awarded only in cases involving the most egregious conduct.'" *Xspedius Mgmt. Co. of Va. v. Stephan*, 611 S.E.2d 385, 387 (Va. 2005) (quoting *Bowers v. Westvaco Corp.*, 419 S.E. 2d 661, 668 (Va. 1992)).  "Where the act or omission complained of is free from fraud, malice, oppression, or other special motives of aggravation, damages by way of punishment cannot be awarded, and compensatory damages only are permissible." *Id.* (internal quotations and citations omitted).  "[M]alice may be shown if the defendant's actions were 'prompted by ill will, malevolence, grudge, spite, wicked intention or a conscious disregard of the rights of another.'" *Peacock Buick, Inc. v. Durkin*, 277 S.E.2d 225, 227 (Va. 1981) (quoting *Lee v. Southland Corp.*, 244 S.E.2d 756, 759 (Va. 1978)).

The court finds that Armstrong has failed to demonstrate, by a preponderance of the evidence, that punitive damages are warranted under Virginia law.  As noted in the findings of fact, Acord did not act with malice when she trespassed Armstrong's home on June 9, 2017.  Her motivation was to retrieve her work laptop, necessary for her employment with Sentara Health, and to obtain clothing for herself and her daughter.  Her actions were not prompted by ill will,

malevolence, grudge, spite, or wicked intention.  Armstrong was aware of Acord's presence and

purpose, yet he refused her access to her possessions.  It was Acord, not Armstrong, who called

the police to deescalate the situation and assist her in retrieving her property.  Her limited entry

to retrieve items necessary for work and to care for her daughter does not constitute the type of

"most egregious conduct" necessary to warrant an award of punitive damages under Virginia

law.  Accordingly, the court declines to award punitive damages.[12]

## IV.  CONCLUSION

For the foregoing reasons, the court will enter judgment consistent with its findings and

conclusions herein, and award Armstrong $797.88 on his conversion claim relating to the key

fob and passport, and $200.00 on his trespass claim for the damage to his property.

An appropriate order and judgment will be entered.

Entered: November 5, 2025

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge

---

[12]  To the extent that Armstrong argues that Acord consciously disregarded his property rights and therefore acted with malice, the court finds that her conduct does not rise to the level necessary to support such an extraordinary remedy.  Given the tumultuous nature of the relationship between Armstrong and Acord, in which both parties contributed to the conflict, the court concludes that such relief is not warranted.  While the court recognizes that trespass constitutes a serious violation of property rights, the unique circumstances of this case do not justify the imposition of punitive damages.